Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**
2410 Camino Ramon, Suite 315
San Ramon, CA 94583
T: 925-543-2555
F: 925-369-0344

Charles J. LaDuca (*pro hac vice* forthcoming) (charles@cuneolaw.com)
Michael J. Flannery (196266) (mflannery@cuneolaw.com)
**CUNEO GILBERT & LADUCA. LLP**
4725 Wisconsin Ave. NW, Suite 200
Washington. D.C. 20016
T: 202-789-3960
F: 202-789-1813

William M. Audet (117456) (waudet@audetlaw.com)
Gwendolyn R. Giblin (181973) (ggiblin@audetlaw.com)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
T: 415-568-2555
F: 415-568-2556

Donald R. Pepperman (109809) (dpepperman@bakermarquart.com)
**BAKER & MARQUART LLP**
2029 Century Park East, Sixteenth Floor
Los Angeles, CA 90067
**T:** 424-652-7804
**F:** 424-652-7850

Attorneys for Plaintiffs
Rajdave Bhandari and Jevdet Rexhepi,
 on behalf of themselves
and all others similarly situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAJDAVE BHANDARI and JEVDET REXHEPI, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TOYOTA MOTOR SALES USA, INC., and DOES 1-10, inclusive,<br><br>Defendants. | No. 18-cv-6184<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**JURY TRIAL DEMANDED** |



Plaintiffs, Rajdave Bhandari and Jevdet Rexhepi, bring this putative class action on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure 23 and California Civil Code section 1781, and assert the following based on personal knowledge as to allegations regarding Plaintiffs' own acts and firsthand experiences and, as to all other matters, on information and belief:

## INTRODUCTION

1.     Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS"), is a California corporation that is responsible for the marketing, sale, distribution, and customer service for Toyota and Lexus vehicles sold throughout the United States.

2.     At least as early as 2008, TMS became aware that the engines in Toyota hybrid vehicles were stalling suddenly and without warning due to a defect within the hybrid inverter assembly, which converts high-voltage direct current (*i.e.,* DC) stored in the battery into high-voltage alternating current (*i.e.,* AC) for the motor generator, and converts AC into DC during regenerative braking for storage in hybrid vehicles' batteries. It took several years, however, before the National Highway Traffic Safety Administration ("NHTSA") opened an investigation into those complaints by owners of 2006 model-year Toyota Highlander hybrids whose engines stalled without warning, with more than two-thirds of them occurring at speeds of at least 40 miles per hour.

3.     In response to NHTSA's investigation, TMS explained the problem as follows:

> The inverter assembly is part of the hybrid system of the subject vehicles. Inside the inverter assembly is an Intelligent Power Module (IPM) which contains a control board equipped with transistors, known as Insulated-Gate Bipolar Transistors (IGBT). The transistors on the control boards in some of the subject vehicles were ***inadequately soldered*** and could be

damaged from heat caused by a large current during high-load driving.

(Emphasis added.)

4. In actuality, the solder used to attach the transistors comprising the IGBT was just one of the issues of which TMS was aware regarding IPM failure. TMS was also aware that the composition of the materials used to manufacture the solder was a factor in IPM performance and that, as of 2008, the composition of the solder had been changed several times in an effort to correct the problem, to no avail.

5. When it responded to NHTSA's information requests in June 2011, TMS acknowledged that malfunctioning and failing transistors on the IPM control board (*i.e.,* the IGBT) affected 2006 and 2007 model-year Toyota Highlander and Lexus RX400h hybrid vehicles, causing the vehicles "to enter a fail-safe/limp-home mode that limits the driving speed of the vehicle. Also, it is possible that the hybrid system will shut down while the vehicle is being driven, causing the vehicle to stall suddenly, increasing the risk of a crash."[1]

6. Thus, in June 2011, TMS conducted a safety recall for the purpose of replacing the IPMs in approximately 80,000 Lexus RX400h and Toyota Highlander hybrids at a cost of ***at least*** $3,000 for each IPM that was replaced.

---

[1] Although TMS characterizes limp-home mode as "fail-safe," it is actually another reason that IPM failure poses a serious safety risk. In addition to causing the loss of power-assisted steering and brakes, the engine's ability to propel the vehicle is drastically reduced in limp-home mode and lasts only as long as the battery holds a charge; after that, the entire hybrid system shuts down completely. Thus, rather than telling them to "limp" home, TMS instructs customers to immediately pull over to the side of the road when the vehicle enters limp-home mode.



7.    Even after the safety recall, however, NHTSA continued to receive complaints about stalling in RX400h and Highlander hybrid vehicles, some of which specifically identified a failed IPM and/or inverter as the cause of the stall.

8.    In September 2013—more than two years after the safety recall involving 2006 and 2007 model-year Toyota Highlander and Lexus RX400h hybrid vehicles—TMS conducted a second safety recall for the purpose of replacing the IPM. The second recall involved one additional model-year of the Lexus RX400h (*i.e.,* 2006 through 2008 model-year vehicles) and three additional model-years of the Toyota Highlander (*i.e.,* 2006 through 2010 model-year vehicles).

9.    This time, however, TMS abandoned the reference to "inadequately soldered transistors" as the cause of IPM failure. Instead, TMS asserted that "higher operating temperatures exceeding the allowable temperature of the lead-based solder underneath the specific IGBT(s) [*i.e.,* transistors)] could occur. If this occurs, the solder could degrade and eventually cause heat damage to the IGBT(s) . . . ."

10.   In other words, IPM transistors (as well as the solder that attaches the transistors to the IPM control board) were failing prematurely due to high operating temperatures. Once again, TMS explained that this could result in the vehicle entering limp-home mode or in the hybrid system shutting down suddenly while the vehicle is being driven, "increasing the risk of a crash." Thus, once again, TMS instructed its dealers to replace the IPM in each affected vehicle (approximately 130,000 of them) at a ***minimum*** cost of $3,000 for each replaced IPM.

11.   Thus, although TMS replaced the IPM only if the dealer determined that "the inverter contain[ed] suspect transistors" in the 2011 recall, in the later, more expansive recall that was announced in

September 2013, TMS notified "*[a]ll* known owners of the subject vehicles . . . to return their vehicles to a Toyota or Lexus dealer for replacement of the IPM with an improved one using lead-free solder." In other words, TMS replaced only some of the IPMs during the initial recall, but replaced all IPMs during the more inclusive recall (which encompassed the vehicles that were the subject of the initial recall as well as others).

12.    By the time that "lead-free solder" was determined to be the solution for the problems causing IPM failure in September 2013, all 2010 through 2013 model-year Toyota Prius hybrids—which were also equipped with inordinately failure-prone IPMs—were already on the road and the 2014 model-year Prius hybrids were already being sold, and IPMs continued to fail in those vehicles long after TMS attributed the problem to solder that was not lead-free.

13.    Accordingly, in February 2014—five months after the second RX400h/Highlander hybrid recall that TMS announced in September 2013—TMS announced a ***third*** safety recall (*i.e.,* **Safety Recall E0E**) due to IPM failure in its Prius hybrids.

14.    Like the previous recalls, the purpose of the Prius recall was to remedy IPMs that were failing due to "transistors that may become damaged due to high operating temperatures." Indeed, as an electrical engineering professor who specializes in hybrid vehicle power systems at the University of Michigan explained in a news report that was published after this lawsuit was filed, the "auto industry is trying to find a substitute for the silicon transistors, but so far continues to use IGBTs. It is likely that the transistor loads are at the heart of Toyota's problem" with the IPMs installed in the Prius hybrids that are the subject of the present action. Ralph Vartabedian, "Toyota Prius software fix may reduce fuel

efficiency, experts say," *The Los Angeles Times* (Feb. 18, 2018), available at http://www.latimes.com/local/california/la-fi-toyota-prius-defect-20180218-story.html (copy attached as **Exhibit A** hereto).

15.   In other words, Toyota IPMs failed because the silicon transistors that comprise the IGBTs are unable to tolerate the high temperatures to which they are exposed under normal driving conditions (hereinafter, the "IPM Defect"). But the Prius recall differed from the previous Rx400h/Highlander recalls in two fundamental ways.

16.   The first way the Prius recall differed from the other two safety recalls is that it ultimately involved more than ***800,000*** hybrid vehicles—roughly ***eight times*** the number of vehicles involved in either of the first two recalls.

17.   The second way the Prius recall differed from the recalls involving the Rx400h/Highlander recalls is related to the first: unlike the previous two recalls, in which TMS replaced the IPMs to eliminate the IPM Defect in the Rx400h and Highlander hybrids, TMS decided to "reflash" (*i.e.,* update) the software governing the power management engine control unit ("ECU") and the generator motor ECU in lieu of replacing the costly IPMs in the Prius hybrids.

18.   There is no question that the decision to update the software instead of replacing defective IPMs resulted in enormous cost savings: whereas the software update cost $85 per vehicle, replacing a defective IPM cost ***at least*** $3,000 per vehicle—allowing TMS and its corporate affiliates to save a ***minimum*** of ***$2,332,000,000*** (that is, 800,000 vehicles multiplied by a minimum of $3,000 per IPM = $2,400,000,000 – $68,000,000 (*i.e.,* 800,000 vehicles multiplied by $85) = $2,332,000,000).

19.   As TMS knew, however, the software update was ***not*** an adequate substitute for replacing the defective IPMs in those vehicles. To

1   the contrary, the defective IPMs that were installed in the inverters of

2   hundreds of thousands of Prius hybrids continued to malfunction and fail,

3   exposing Prius drivers, occupants, and those in proximity to Priuses whose

4   IPMs malfunction and fail to precisely the same risks of injury and death

5   that required TMS to conduct safety recalls in connection with defective

6   IPMs on at least three separate occasions.[2]

7   20.   Moreover, the ECU software update actually ***increased*** the

8   likelihood of a crash by preventing the engines in those vehicles from

9   accelerating properly (*e.g.,* leaving the driver unable to get out of the way

10   of approaching vehicles), while reducing their gas mileage and increasing

11   exhaust emissions. And, as it had in connection with the Lexus RX400h

12   and Toyota Highlander hybrids, TMS admitted that IPM transistors in

13   Prius hybrids "could become damaged when operating the vehicle under

14   high-load driving conditions, such as accelerating during highway driving"

15   and that this could result in the vehicle entering limp-home mode or in the

16   hybrid system shutting down suddenly while driving, "resulting in the

17   vehicle stopping while being driven and increasing the risk of a crash."

18   21.   Indeed, the sheer volume of IPMs that have been replaced in

19   2010 through 2016 model-year Prius hybrids constitutes a safety defect

20   *per se* according to applicable standards employed by NHTSA.

21   22.   Under the circumstances, TMS's decision to put cost savings

22   ahead of its customers' safety was—and is–-nothing short of appalling.

23

24

25   [2] Technically, there were actually ***four*** safety recalls. In July 2015
TMS iniated **Safety Recall F0R**, which added another 108,600 Prius
hybrids to Safety Recall E0E, which were previously excluded from that
recall when it was originally announced in February 2014. Like the
others, the risk of injury and death created by IPM failure required TMS
to conduct each of them as safety recalls. As it had in February 2014,
however, TMS still did ***not*** include all 2010 through 2014 model-year
Prius hybrids in the recall.

26

27

28



But TMS's cynical attempt to save money at its customers' expense had yet another dimension. Despite being aware of the IPM Defect since 2008 (at the very latest), in August 2014—six months after it announced the initial Prius safety recall in February 2014—TMS stifled complaints by Prius drivers whose IPMs failed by announcing a "Warranty Enhancement Program" by which it would extend the warranty coverage for the IPM to 15 years with no mileage limitation because "[w]e at Toyota care about customers' ownership experience."

23.   But TMS's "Warranty Enhancement Program" was not quite what TMS represented it to be. California and many other states had already required TMS to provide 15 years or 150,000 miles of warranty coverage for the IPM and other emissions-related parts. In actuality, the Warranty Enhancement Program was a sham that enabled TMS to treat the Prius hybrid safety recall as a seemingly benign extended warranty program.

24.   The defective IPMs in Prius hybrids are **not** a benign problem; they are ticking time bombs that TMS has attempted to bury with an extended warranty. And those time bombs are still ticking—not only in 2010 through 2014 model-year Prius hybrids, but in 2015 and 2016 model-year Prius hybrids as well.

25.   In short, TMS's "Warranty Enhancement Program" turned the rationale that informs a safety recall on its head by attempting to justify TMS's refusal to replace the defective IPMs **before** they fail and thereby **prevent** the risk of injury and death—**which is the very purpose of a safety recall**—by offering to replace the defective IPMs **after** they fail. Given that even TMS admits that the defective IPMs pose a serious risk of injury and death, offering an "extended warranty" is too little, too late.

26. Accordingly, on January 31, 2018, Plaintiff Rexhepi iniated a putative class action on behalf of himself and a proposed class of Prius current and former owners and lessees in California Superior Court for the County of Los Angeles (the "State Case"), alleging that, by falsely claiming that a software update corrected the defective IPMs when it did not, and by refusing to inform Prius drivers that TMS was needlessly exposing them to the risk of injury and death to save money, TMS has engaged in common law fraudulent concealment and trespass to chattels, and has violated the statutory proscriptions set forth in, *inter alia,* the California Commercial Code, the Consumers Legal Remedies Act, the Computer Fraud and Abuse Act, the TREAD Act, and the Unfair Competition Law. Accordingly, Plaintiffs bring this action on behalf of themselves and all other California residents who own or lease, or have owned or leased, 2010 through 2016 model-year Prius hybrids (collectively, "Class Vehicles") and seek an order requiring TMS to replace the IPMs in those vehicles, to compensate those who paid to replace IPMs at their own expense, and to award restitution and statutory and punitive damages in amounts that will be proved at trial.

27. On February 6, 2018, TMS issued a bulletin in which it instructed its dealers to respond to questions from the news media and customers about Safety Refalls E0E and F0R that those recalls eliminated the IPM Defect by updating the ECU software in Class Vehicles (the "February 6 IPM Bulletin").

28. Specifically, in the February 6 IPM Bulletin, TMS alerted its dealer network that "[s]ome news outlets may release reports in the coming days about class-action lawsuits and specific concerns related to the effectiveness of the remedy for Safety Recalls E0E and F0R; involving the Prius and Prius V. These reports may claim that the remedy for these

-8-

1   programs does not adequately address the safety risks identified." In the

2   same bulletin, TMS instructed its dealers to tell drivers of Class Vehicles

3   who expressed concern about news reports about the IPM Defect that

4   "that the Safety Recall remedy addresses the safety defect."

5       29.   As explained herein, TMS's assertion that the safety recalls

6   eliminated the safety risks created by the IPM Defect is false. Indeed,

7   despite TMS's representation that the safety recalls eliminated the IPM

8   Defect, TMS instructed its dealers to send all IPMs and inverters they

9   remove from Class Vehicles to TMS, and have repeatedly asserted that

10  testing and analysis of those IPMs is necessary to protect its customers.

11  Plaintiffs are informed and believe that TMS made these false statements

12  for the purpose of creating false sense of security by members of the

13  proposed class, and to preserve Toyota's public image, regardless of the

14  risk of injury and death posed by the IPM Defect.

15      30.   Plaintiffs are also informed and believe that TMS instructed

16  its dealers to collect the malfunctioning and/or failed IPMs and inverters

17  around the same time it issued the February 5 IPM Bulletin.

18      31.   By March 30, 2018, TMS had already received over *800* IPMs.

19  Less than five weeks later, the number of IPMs that dealers had sent to

20  TMS (or its agent, Exponent). Less than five weeks later, that number had

21  climbed to more than *1,000*. And, because the voluminous return of

22  lifetime components (*i.e.,* automobile components that are designed to last

23  for the life of the vehicle without maintenance, repair, or replacement) is

24  a strong indicator that (among other things) a defect continues to exist.

25      32.   On February 5, 2018, another putative class action, *McCarthy*

26  *v. Toyota Motor Corp.*, No. 18-cv-0201-JLS-KES (C.D. Cal. Feb. 5, 2018),

27  which set forth many of the same causes of action that Plaintiff Rexhepi

28  had alleged in the State Case, was filed in this Court.

-9-

33.  On July 13, 2018, the judge presiding over the State Case announced *sua sponte* that it would be stayed pending the resolution of the *McCarthy* action. Plaintiff Rexhepi therefore dismissed his claims in the State Case to pursue them in the present action for a variety of reasons, including, but not limited to **(a)** the IPM Defect poses a serious risk of injury and/or death to occupants of and persons driving near Class Vehicles when the IPM becomes manifest; **(b)** the causes of action in the State Case differ substantially from the claims for relief alleged in *McCarthy* action; **(c)** Plaintiffs' counsel are represented by counsel who have extensive experience with complex litigation involving defective automobiles; and **(d)** counsel for the *McCarthy* plaintiffs have potential conflicts of interest resulting from their simultaneous representation of a Toyota dealer in *Hogan v. Toyota Motor Sales U.S.A., Inc.,* No. 30-2017-00933647-CU-FR-CJC (Orange Cty. Super. Ct. July 25, 2017), which is based in part on the operative facts of the State Case and the *McCarthy* action.

## **PARTIES**

34.  Plaintiff Rajdave Bhandari is a resident of the County of Alameda, California, who owns a 2012 model-year Toyota Prius hybrid.

35.  Plaintiff Jevdet Rexhepi is a resident of the County of Los Angeles, California, who owns a 2012 model-year Toyota Prius hybrid.

36.  Defendant Toyota Motor Sales, USA, Inc., ("TMS") is a California corporation whose headquarters is located in Plano, Texas, and is the sales, marketing, distribution, and customer service arm for Toyota and Lexus vehicles in the continental United States.

37.  Plaintiffs do not know the true names or capacities of the persons sued as Defendants Does 1 through 10, and therefore sue those Defendants by fictitious names. Plaintiffs believe that each of the Doe



Defendants was in some manner legally responsible for the wrongdoing alleged in this Complaint. Plaintiffs will amend this Complaint to set forth the true names and capacities of these Defendants when they have been ascertained, along with appropriate additional allegations as may be required.

## JURISDICTION AND VENUE

38.   This Court has diversity jurisdiction over the claims asserted herein on behalf of a nationwide class pursuant to 28 U.S.C. section 1332, as amended in February 2005 by the Class Action Fairness Act. Jurisdiction is proper because

a.   the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs, the proposed class includes more than 100 members, more than one of whom reside in a state other than California; and

b.   TMS has purposefully availed itself of the privilege of conducting business activities within the State of California, where TMS engaged in the unlawful conduct alleged in this Complaint.

39.   Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391, and California Civil Code section 1780(d), because the conduct alleged in this Complaint occurred in this judicial district.

## GENERAL ALLEGATIONS

40.   Plaintiffs bring this action individually and on behalf of all California residents who own or lease, or have owned or leased, a Class Vehicle.

41.   Each Class Vehicle is equipped with a hybrid inverter assembly that converts high-voltage direct current (*i.e.,* DC) stored in the battery into high-voltage alternating current (*i.e.,* AC) for the motor

generator and converts AC into DC during regenerative braking for storage in Class Vehicles' batteries.

42.    Inside the hybrid inverter assembly is an IPM (Intelligent Power Module), which contains a control board equipped with transistors that are susceptible to becoming damaged by exposure to heat under normal driving conditions, particularly when the engine is under heavy load (*e.g.,* towing a trailer, driving up steep hills, sharp acceleration).

43.    When the transistors malfunction as a result of the IPM Defect, it can cause Class Vehicles to enter "limp-home mode"—meaning that the power-assisted steering and braking is disabled and the speed of the vehicle is suddenly substantially reduced. If the battery is not charged sufficiently, however, the vehicle will not enter limp-home mode and the engine will stall.

44.    Similarly, if the IPM Defect causes the transistors to fail, the engines in Class Vehicles will stall suddenly and unexpectedly, frequently at highway speeds, thereby increasing the risk of injury and death as a result of a collision.

45.    Both failure modes are recognized safety risks which can, among other things: **(a)** cause the driver to lose control of the Class Vehicle, **(b)** result in a crash, and/or **(c)** leave the driver stranded on the road, where s/he is susceptible to, among other things, being struck by another vehicle.

46.    Indeed, as alleged in paragraphs 67 through 80, below, Prius drivers have reported a variety of dangerous stalling incidents and material economic harms resulting from the IPM Defect, ranging from reduced gas mileage to a collision that caused the complete destruction of a Class Vehicle that had stalled repeatedly in prior incidents that were reported directly to, but ignored by, TMS.

COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES

47.   TMS has been aware of the IPM Defect from the time it began selling the first Class Vehicles to consumers as a result of its access to multiple sources not available to members of the proposed class (defined at paragraphs 94 through 96, below; hereinafter, "proposed Class Members"), including but not limited to, pre-release testing of Class Vehicles, Failure Mode Effects Analyses (FMEAs) and other analytical tools, and its experience with IPMs installed in Prius and other vehicles that predate Class Vehicles.

48.   Indeed, TMS has been aware of stalling as a result of thermally-induced IPM failure in its hybrid vehicles at least as early as 2008. For example, in field reports and other documents TMS included in its response to information requests that NHTSA propounded in a defect investigation it opened as a result of stalling complaints by drivers of Toyota Highlander hybrid vehicles in 2011, TMS recognized that the vehicles' engines were stalling as a result of the IPM Defect. TMS also recognized that stalling increases the risk of a crash, which can result in injury and death.

49.   TMS told NHTSA that the IPM transistors were failing because they had been soldered inadequately. Accordingly, TMS conducted a safety recall of approximately 80,000 Toyota Highlander and Lexus 400h hybrid vehicles. The same year, TMS instructed Toyota dealers to correct the IPM Defect by replacing the IPMs in those vehicles with new (presumably non-defective) IPMs if "the inverter contain[ed] suspect transistors."

50.   Just over two years later (in September 2013), TMS issued another safety recall as result of the IPM Defect. Rather than claiming that "inadequately soldered transistors" was the cause of the safety issue (as it did when it conducted the recall in 2011), TMS claimed that heat

1  was damaging both the solder and the IPM created by "high-load
2  driving" conditions.

3      51.    The second safety recall involved all the previously-recalled
4  vehicles plus one additional model-year of the Lexus hybrids (*i.e.,* 2006
5  through 2008 model-year Lexus RX400h) and three additional model-
6  years of the Highlander hybrids (*i.e.,* 2006 through 2010 Toyota
7  Highlander). Again, TMS explained that the IPMs can malfunction and
8  fail, causing the vehicles to enter limp-home mode or to stall suddenly
9  and unexpectedly, thereby increasing the risk of injury and/or death in
10  a crash. As before, TMS addressed the IPM Defect by replacing the
11  defective IPMs in just over 100,000 affected vehicles with new
12  (presumably non-defective) IPMs.

13      52.    This time, however, the decision to replace the defective IPMs
14  did not depend on dealers finding "suspect" transistors. Rather, TMS
15  stated in a Defect Information Report to NHTSA that it had been
16  investigating the IPM Defect since June 2011 and had found that IPMs
17  were failing in vehicles "outside the scope of the above [*i.e.,* previous]
18  recall and ultimately concluded in late August 2013 that the use of lead-
19  based solder was causing the transistors to fail. Accordingly, in
20  September 2013 TMS announced that "[a]ll known owners of the subject
21  vehicles will be notified by first class mail to return their vehicles to a
22  Toyota or Lexus dealer for replacement of the IPM with an improved one
23  using lead-free solder."

24      53.    Less than six months after that (in February 2014), TMS
25  conducted yet another safety recall as a result of the IPM Defect. This
26  time TMS announced that nearly one million 2010 through 2014 model-
27  year Toyota Prius hybrid vehicles were susceptible to stalling due to

28

**COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES**

heat-induced IPM transistor malfunction and failure, which increased the risk of a crash that could cause injury and death.[3]

54.    Despite the fact that TMS had spent years analyzing the IPM Defect and had told NHTSA that the solution was replacing the IPMs with "an improved one using lead-free solder" in the RX400h/Highlander hybrids, TMS made no mention of lead-based solder in the Defect Information Report it submitted to NHTSA in connection with the Prius hybrid recall—notwithstanding that nearly all the recalled Priuses were already on the road by the time TMS discovered the ostensible "solution" for the problems created by the IPM Defect. Instead, TMS told NHTSA that the IPM Defect was caused by a software issue:

> Due to certain characteristics of the software used to control the boost converter in the IPM, higher thermal stress could occur in specific IGBT's used for the operation of the boost

_____

[3] In the February 2014 announcement, TMS described the safety recall as involving just over 700,000 vehicles. In July 2015, TMS announced that an additional 108,600 Prius hybrid hatchbacks would also be included in the safety recall. As discussed below, many other Prius hybrid vehicles were affected by the IPM Defect, but TMS omitted them from the safety recall. As it had in February 2014, however, TMS still did **not** include **all** 2010 through 2014 model-year Prius hybrids in the recall. As indicated by the complaints submitted to NHTSA and quoted below, Prius drivers complained that Toyota dealers refused to address the IPM Defect if the vehicle was not among those whose vehicle identification number (VIN) was not included in TMS's recall database.

In late 2017 TMS announced yet another safety recall involving 2016 model-year Prius hybrids—this time calling for the replacement of the entire hybrid inverter assembly. TMS stated that a problem during the manufacturing process "may cause components in the inverter assembly to become damaged during normal operation. Under certain conditions, this can lead to a hybrid system shut down. While power and braking assist will function normally, a hybrid system shutdown while driving at higher speeds could increase the risk of a crash." Yet, while conceding that it was "**unable to provide an estimate of the percentage of vehicles that actually contain the defect**," (emphasis added), TMS limited the recall to just **six** (6) 2016 model-year Prius hybrids by including only those six vehicles' Vehicle Identification Numbers ("VINs") in TMS's recall database. Plaintiff is informed and believes that this was yet another ploy by TMS to conceal the nature and scope of the IPM Defect, which affects **all** 2010 through 2016 model-year Prius hybrids.



converter, which is required during high-load driving such as accelerating during highway driving.

55.    As discussed above, the IPM Defect is the result of silicon transistors' inability to function properly when exposed to thermal stress, ***not*** the software that controls the ECUs. *See* Ex. A at 6-7. Yet, rather than replacing the IPMs in those vehicles with non-defective IPMs, TMS announced that it would cure the IPM Defect by updating the software in the motor generator and power management ECUs at approximately $85 per vehicle, thereby avoiding the cost of replacing the IPMs for least $3,000 per vehicle.

56.    Several months later, TMS notified Prius drivers that, in its

continuing efforts to ensure the best in customer satisfaction, Toyota is announcing a Warranty Enhancement Program to extend the warranty coverage for repairs related failure of the Intelligent Power Module (IPM). The vehicles covered under this Warranty Enhancement Program must first have Safety Recall E0E (launched in mid-February 2014) performed (if applicable).

57.    In keeping with its efforts to actively conceal the existence, nature, scope, and safety riska created by the IPM Defect, TMS falsely represented to Prius owners and lessees that, by modifying the ECU software, the "majority of vehicles will not experience failure of the IPM" and that TMS was "offering the New Vehicle Warranty Extension to assure you that we stand behind our product."

58.    In other words, after falsely representing to Prius drivers that the software update completely corrected the IPM Defect, TMS cynically announced that it was extending the warranty that applied to IPMs as a means of ensuring "customer satisfaction."

59.    TMS reinforced this message after the filing of the original Complaint in this action (on January 31, 2018) when it issued a bulletin to its dealers six days later (on February 6, 2018). In that bulletin, TMS



advised its dealers that although they may read news reports that question the effectiveness of the software "remedy" employed in the Prius recalls, "Toyota believes that these Safety Recall remedy actions and related Warranty Enhancement Programs (ZE3 and ZF5) **are the appropriate measures for customer safety and satisfaction**." (Emphasis added.) The bulletin went on to instruct dealers that, if they "are contacted by a Prius or Prius V driver concerned about these reports," **the dealers should "[e]xplain that the Safety Recall remedy addresses the safety defect**." (Emphasis added.)

60.    TMS knew these representations were false; their purpose was to ensure the effectiveness of its fraudulent concealment of the true nature and scope of the IPM Defect. In short, TMS knew at all relevant times that the software "upgrade" did **not** correct the IPM Defect and that the so-called "Warranty Enhancement Program" was merely a ruse to make it appear that Toyota was confident that the software "upgrade" actually solved the problem.

61.    In actuality, TMS succeeded in circumventing the very purpose of a safety recall: It failed to correct a known safety issue **before** it resulted in serious injuries or fatalities by falsely claiming that the software "upgrade" corrected the IPM Defect and then offered a warranty that implied confidence in the software "fix" and enabled TMS to avoid the enormous cost of replacing the IPMs in **all** Class Vehicles (as it had done with the RX400h and Highlander hybrids) by replacing IPMs in roughly a million Priuses only **after** they failed (assuming the driver and the vehicle survived any resulting collision).

62.    Contrary to TMS's representations, the software modification actually **exacerbated** the safety risks and economic harm to proposed Class Members resulting from the IPM defect by causing the engines in

-17-



Class Vehicles to become noticeably more sluggish and unable to accelerate normally under everyday driving conditions.

63.    Diminished engine performance and the inability to accelerate normally—which occurs when IPM malfunction puts the engine in "limp-home" mode—is a safety hazard because it puts the driver (as well as other vehicle occupants) at risk of a collision due to the inability to avoid being struck by approaching vehicles.

64.    For years, TMS has marketed Class Vehicles as safe, efficient and environmentally-friendly while concealing what it actually knew about the IPM Defect. Specifically, TMS knew that the IPM Defect has an inordinate propensity to put the occupants of Class Vehicles, as well as those who drive near Class Vehicles, at an inordinate and unacceptable risk of injury and death when Class Vehicles enter limp-home mode or stall, and that the software update TMS offered in conjunction with the 2014 recall served to mask the existence, nature, and scope of the IPM Defect.

65.    TMS's marketing strategy was quite effective: The Prius is a hugely popular and top-selling vehicle ***precisely*** because TMS marketed it as an economical and environmentally-friendly form of transportation. Indeed, as TMS acknowledges in a press release, as of October 2014 at least ***7,000,000*** Prius hybrid vehicles had been sold, which TMS attributed to the "appeal of excellent fuel economy, driving dynamics and the quality of our vehicles combined with our dealers' dedication to customer service . . . ." Press Release, "Toyota is Global Hybrid Dealer with Sales of 7 Million" (Oct. 14, 2014).[4]

---

[4]http://toyotanews.pressroom.toyota.com/releases/toyota+global+hybrid+leader+sales+7mm.htm (last accessed January 30, 2018)

66.    Contrary to these representations, TMS has not only known about the IPM Defect for more than a decade, it has rebuffed requests by its own dealers to correct the IPM Defect. One local dealer has described the situation as follows:

> Toyota had previously issued a safety recall (Recall EOE-Prius / FOR Prius V) to reflash software in the Prius Inverter. **_Vehicles continue to suffer Inverter failure even after having Recall EOE-Prius / FOR Prius V completed. Therefore, we have asked Toyota to address this ongoing safety concern, but we have yet to receive a response_**. We hope to have more information for you once Toyota responds. We will post the updates on our website at Claremonttoyota.com.

(Emphasis added.)[5]

67.    In actuality, the situation was even more dire than this Toyota dealership had described. Prius drivers had been complaining about dangerous engine malfunctions and stalling events for **_years_** before, during, and long after TMS announced the recall of certain 2010 through 2014 model-year Prius hybrids in February 2014. Indeed, drivers of 2009 model-year Prius hybrids—as well as other Prius hybrids that were **_not_** included in the recall (such as Prius hybrid plug-in models)—had complained to NHTSA about the same problems that the recalled vehicles exhibited; and drivers of the vehicles that **_were_** included in the recall complained to NHTSA that their vehicles continued to exhibit the same problems **_after_** they had received the software update that TMS claimed would correct the IPM Defect. TMS repeatedly ignored these and many other complaints and misled its customers about the IPM Defect, and Prius drivers are **_still_** complaining

---

[5] https://www.claremonttoyota.com/dealer-initiated-prius-shop-sale (last accessed on January 30, 2018)



to NHTSA about the same problems that the recall ostensibly corrected in 2010 through 2016 model-year Class Vehicles.

68.    For example, two months after the recall was announced the owner of a 2013 model-year Prius complained to NHTSA that his vehicle stalled repeated **after** the software update was performed[6]:

> THE CONTACT OWNS A 2013 TOYOTA PRIUS. THE CONTACT STATED THAT **AFTER THE VEHICLE WAS SERVICED UNDER NHTSA CAMPAIGN NUMBER: 14V053000 (HYBRID PROPULSION SYSTEM) THE VEHICLE STALLED CONTINUOUSLY.** BOTH MANUFACTURER AND DEALER HAVE BEEN MADE AWARE OF THE FAILURE. THE VEHICLE HAD NOT BEEN REPAIRED. THE FAILURE MILEAGE WAS 11,436.

69.    Three months later (in July 2014), this complaint was submitted to NHTSA:

> **THE HYBRID INVERTER ASSEMBLY FAILED WHEN I TRIED TO ACCELERATE FROM A STOP ONTO A RURAL HIGHWAY. THIS OCCURRED APPROXIMATELY TWO MONTHS AFTER RECEIVING THE MOTOR GENERATOR ECU AND POWER MANAGEMENT ECU SOFTWARE UPDATE THAT WAS INTENDED TO PREVENT THIS TYPE OF FAILURE.** I WAS NOTIFIED OF THIS UPDATE/RECALL IN LATE MARCH 2014 AND HAD THE UPDATE COMPLETED AT A AUTHORIZED TOYOTA SERVICE CENTER.

70.    In another complaint that was filed in July 2014, the driver of a 2010 model-year Prius that had the software update performed several months earlier went into limp-home mode while driving at 65 miles per hour:

> WAS TRAVELING ABOUT 65 MPH ON ROUTE 11 IN CT WHEN RED LIGHTS COME ON AND CAR SLOWS TO 20 MPH. PULLED TO SIDE OF ROAD AND CALLED AAA/TOWED TO HARTFORD TOYOTA IN HARTFORD CT. **FIRST TOLD IT WAS A HYBRID BATTERY THEN TOLD IT WAS THE INVERTER WHICH THEY SAID IS**

---

[6] The complaints that follow were retrieved verbatim from NHTSA's database, where they appear in capital letters and are reprinted here without change, except for emphasis in bold, which has been added.



**ON BACK ORDER. NOW I'M GETTING THE RUN AROUND FROM THE MAIN OFFICE IN CALIFORNIA. BROUGHT CAR IN FOR A RECALL ON SOFTWARE UPDATE IN FEB 2014** AND FROM WHAT I READ THIS MAY CAUSE THE INVERT TO FAIL THANKS FOR YOUR ATTENTION IN THIS MATTER.

71.     Similarly, the driver of a 2011 model-year Prius complained in February 2016 that his vehicle stalled suddenly (for a second time) while driving at 40 miles per hour, and that it stalled again after the software update was performed:

**THE CONTACT OWNS A 2011 TOYOTA PRIUS. WHILE DRIVING 40 MPH, THE VEHICLE LOST POWER.** THE VEHICLE WAS ABLE TO BE RESTARTED. **THE FAILURE RECURRED TWICE. THE DEALER UPDATED THE SOFTWARE. THE VEHICLE WAS REPAIRED; HOWEVER, THE FAILURE RECURRED.** THE VEHICLE WAS TAKEN TO THE DEALER A SECOND TIME WHERE THE TECHNICIAN STATED THAT THEY DID NOT HAVE THE CORRECT CODE FOR THE SOFTWARE. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED. THE APPROXIMATE FAILURE MILEAGE WAS 60,000.

72.     In December 2015 another owner of a 2010 model-year Prius reported that the vehicle stalled after the software "reflash" had been performed:

CHECK HYBRID SYSTEM CAR SHUTS OFF AND CAN NOT RESTART, TRIED SYSTEM RESET PER MANUAL BUT WOULD NOT CLEAR HYBRID. TOWED TO DEALER, DTC CODE 800, TECH SAID THIS WAS THE ONLY CODE. **HAD RECALL EOE REFLASH 04-14-2014** IPM EXTENDED 15 YEARS. CAR WAS IN MOTION PER WIFE. (IT HAD BEEN RAINING) THE DTC P3004800 POWER CABLE MALFUNCTION.

73.     In August 2014 the driver of a 2013 model-year Prius hybrid complained that the vehicle was performing *worse* after it was purportedly "fixed" by performing the software update:

**I HAD MY CAR UPDATED BY TOYOTA THEY SAID IT WAS A VOLUNTARY RECALL , EXACTLY AFTER THE UPDATE I NOW GET 10-15 MILES LESS A GALLON**

-21-



**AND MY VEHICLE HESITATES ON ACCELERATION 1-3 SECONDS**, I HAVE **BROUGHT THE CAR BACK 2 TIMES AND WAS TOLD THAT THEY HAVEN'T HEARD OF ANY COMPLAINTS ABOUT PROBLEMS AFTER THE UPDATE** I LEFT MY CAR WITH THEM BOTH TIMES ON A FRIDAY AND PICKED UP ON A MONDAY THEY SAID THEY RECALIBRATED THE COMPUTER THE FIRST TIME AND IT HAD BETTER MILEAGE UNTIL I FILLED UP AND RESET THE ODOMETER AND BACK TO THE LESS MILEAGE AGAIN, 2ND TIME THEY SAID I NEEDED A FUEL SYSTEM CLEAN AND ANOTHER THING, **I DID THEM BOTH AND NOTHING AGAIN NO CHANGE (THEY SAID IT MIGHT IMPROVE MY MILES SOME)**. I HAVE BEEN ON SOCIAL NETWORK SITE PRIUS CHAT ETC. AND **OTHERS ARE EXPERIENCING THE SAME THING AND MORE I FEEL LIKE IM GETTING A RUN AROUND WITH THEM (TOYOTA) IT HAS COST ME ALMOST $500 TO GET NO WHERE, AND THE LOSS OF MILES IS COSTLY ALSO I OWN A HYBRID AND FEELS LIKE IN DRIVING A STANDARD 4 CYLINDER, THE ACCELERATION DELAY STARTED ABOUT A MONTH AGO.** IM GONNA [*sic*] BRING IT BACK FOR BOTH PROBLEMS AND I EXPECT TO BE TOLD I NEED SOMETHING ELSE (TUNE UP ETC) THAT WONT RESOLVE MY ISSUE THANK YOU.

74.    A similar report was submitted in June 2016, in which the driver of a 2012 model-year Prius complained that his troubles began *after* the software update was completed:

**AFTER TOYOTA POWER MANAGEMENT SOFTWARE RECALL INSTALLED "POWER MANAGEMENT UPGRADE" SOFTWARE IN MY CAR I IMMEDIATELY EXPERIENCED SERIOUS PROBLEMS WITH MY IGNITION / START OF HYBRID/GASOLINE ENGINE**. AFTER PRESSING IGNITION, I HAD TO WAIT 15 TO 20 MINUTES AND PRESS START BUTTON ON/OFF REPEATEDLY UNTIL THE GASOLINE ENGINE IGNITE BUT HYBRID FAILED TO START. IT IS NOT NORMAL BECAUSE A PRIUS HYBRID ENGINE STARTS FIRST NOT THE GASOLINE ENGINE. **TOYOTA HAS DISABLED SOME IMPORTANT FUNCTIONS IN ITS POWER MANAGEMENT RECALL SOFTWARE UPDATE THAT AFFECTS THE HYBRID ENGINE PERFORMANCE AND FAILURE TO START. I DRIVE MY PRIUS 3-4 TIMES A MONTH AND I DID NOT HAVE ANY PROBLEM BEFORE THE RECALL SOFTWARE UPGRADE** BECAUSE PRIUS OWNERS MANUAL CLEARLY SAYS THAT THE BATTERY WITH BE DISCONNECTED BY BATTERY SAVING FUNCTION WHEN YOUR CAR IS PARKED FOR LONG TIME, SEVERAL DAYS, WEEKS. . . .

75.    Others complained that their vehicle stalled, but were later told that the vehicle was not subject to repair because it was not included in the safety recall. For example, in a complaint that was submitted to NHTSA in July 2017, the driver of a 2013 model-year Prius complained that his vehicle had stalled and asked that the software update be performed, only to be refused because the vehicle was not among those included in the recall:

CAR LITERALLY STOPPED ON THE ROAD. IT WAS TOWED TO TOYOTA OF RIVERSIDE, CA. **SAW THERE HAD BEEN A RECALL THAT THE PROBLEM WAS EXACTLY WHAT HAPPENED TO ME**.

**ASKED THE DEALER TO CHECK THE SOFTWARE AS DESCRIBED IN THE RECALL. I WAS TOLD THAT APPLIED ONLY TO 2010-2012 VEHICLES, MINE IS A 2013. ASKED REPEATEDLY, REGARDLESS OF YEAR TO PLEASE CHECK THIS. I HAVE HUGE CONCERNS DRIVING THIS CAR AS IT LEFT ME COMPLETELY STOPPED AND STRANDED, HAD I BEEN ON THE FREEWAY, COULD HAVE BEEN FATAL.** FIRST I WAS TOLD IT WAS THE HYBRID BATTERIES HAD GONE BAD. THEN THEY SAID IT WASN'T THE BATTERIES, IT WAS A FUSE FOR THE HYBRID BATTERY. EXPLAINED MY CONCERNS THAT THIS COULD HAPPEN AGAIN IF IT TRULY WAS THE FUSE?? THEY SAID IT BECAME DISCONNECTED DUE TO VIBRATION. HOW DO YOU DRIVE AND NOT HAVE SOME VIBRATION? ASKED IF IT COULD HAPPEN AGAIN, THEY DIDN'T KNOW. **ASKED REPEATEDLY TO CHECK THE SOFTWARE AS DESCRIBED IN THE RECALL. THEY SAID THEY HAD TOYOTA SAFETY INVOLVED AND THEY DID EVERYTHING THEY REQUESTED OF THEM. THIS DID NOT INCLUDE CHECKING THE SOFTWARE AS I REQUESTED, SO THEY WOULD NOT DO IT.** I ENDED UP DEALING WITH THE MANAGER, DANNY BRIGGS, AND REQUESTED A COPY OF ALL THE ITEMS THAT HAD BEEN CHECKED AND DONE TO MY CAR. HE SAID HE WOULD HAVE THIS FOR ME. WHEN WE PICKED UP THE CAR, THIS WAS NOT GIVEN TO ME. MET WITH HIM, HE SAID THAT WAS ALL HE COULD DO. I TOLD HIM I WAS VERY UPSET, I FEEL LIKE I'M INVOLVED IN A TOTAL "COVER UP" SO THEY WOULDN'T HAVE TO RECALL THE 2013 PRIUS' ALSO. I WAS TOLD I COULD TRADE MY CAR IN THERE IF I DIDN'T FEEL IT WAS SAFE TO DRIVE. I HAD ASKED THEM TO CHANGE THE OIL AND CHECK MY BRAKES, THEY DIDN'T DO IT. IT WAS LIKE THEY JUST WANTED TO GET ME OUT OF THERE AND NOT DEAL WITH IT. **I HAVE NEVER**

**CONTACTED YOUR AGENCY BEFORE, BUT FEEL THAT THIS COULD END UP KILLING SOMEONE IF NOT CHECKED INTO**. THANK YOU.

76.     Others reported that they were also told their vehicle was excluded from the recall after stalling, but were told that the stall must have been caused by something other than the IPM Defect. For example, in July 2016, the driver of a 2012 model-year Prius stalled suddenly while driving at 65 miles per hour and was told that the vehicle must have stalled because it ran out of gas—despite the fact that the vehicle had a full tank of gas—and then discovered that the vehicle was excluded from the safety recall:

> THE CONTACT OWNS A 2012 TOYOTA PRIUS. THE CONTACT STATED THAT **WHILE DRIVING AT 65 MPH, THE VEHICLE STALLED AS THE MASTER WARNING LIGHT ILLUMINATED**. THE VEHICLE WAS TOWED TO THE DEALER. THE TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE AND STATED THAT THE ONLY CODE FOUND WAS RELATED TO LOW FUEL ALTHOUGH **THE VEHICLE HAD A FULL TANK OF FUEL**. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND MADE **THE CONTACT WAS MADE AWARE THAT THE VEHICLE WAS NOT INCLUDED IN NHTSA CAMPAIGN NUMBER: 14V053000 (ELECTRICAL SYSTEM. HYBRID PROPULSION SYSTEM). THE VEHICLE WAS NOT REPAIRED**. THE FAILURE MILEAGE WAS 37,795.

77.     In April 2016 the driver of a 2012 model-year Prius complained that he vehicle stalled repeatedly, but that the dealer denied the vehicle was stalling—even after being shown proof that it was—and refused to check the vehicle because it was not included in the recall:

> WHEN IN THE HIGH 80S+ OUTSIDE, MY 2012 PRIUS C, BOUGHT NEW, HAS NOT STARTED FROM IN A STOPPED POSITION, WITH ALL THE WARNING LIGHTS ON THE DASHBOARD ACTIVATING &, **MANY TIMES, THE HYBRID SYSTEM SHUTTING DOWN WHILE I'M TRYING TO EXIT A DRIVEWAY OR GARAGE, CITY STREET OR PARKING THE VEHICLE, CREATING A SUDDEN STALL & LEAVING ME IN THE PATH OF ONCOMING TRAFFIC. TOOK TO DEALERSHIP MANY TIMES & THEY INSIST MY CAR CAN'T BE DOING WHAT IT'S DOING BECAUSE THEY SEE NO CODES &**

-24-



**IGNORE MY SCREENSHOTS, PICS & VIDEO. WHEN I ASK THEM WHY MY CAR HAS SAME "SYMPTOMS" AS OTHERS OF THE SAME MAKE, MODEL & YEAR, THEIR REPLY IS THAT MY SPECIFIC CAR HAS NOT BEEN RECALLED. THEY WILL NOT EVEN LOOK TO SEE IF THERE ARE PROBLEMS WITH THE SENSOR, INVERTER OR SOFTWARE. MY CAR HAS ONLY 8700 MILES ON IT. I AM AFRAID TO DRIVE IT CAUSE I HAVE NO CLUE WHAT IT'S GOING TO DO & THE DEALERSHIP IS UNCONCERNED. IT SEEMS NEITHER THE NHTSA NOR TOYOTA GIVES A DAMN ABOUT SAFETY.** I THINK THE ISSUE IS THE SOFTWARE IN THE ELECTRONIC CONTROLS OF THE CAR, WITH CURRENT SETTINGS THAT COULD CREATE HEAT IN SOME OF THE TRANSISTORS. 2012 TOYOTA PRIUS ELECTRICAL SYSTEM: SOFTWARE, HYBRID PROPULSION SYSTEM: INVERTER NHTSA CAMPAIGN #14V053000. SUMMARY: IN THE AFFECTED VEHICLES, THE INTELLIGENT POWER MODULE (IPM) INSIDE THE INVERTER MODULE (A COMPONENT OF THE HYBRID SYSTEM) CONTAINS TRANSISTORS THAT MAY BECOME DAMAGED FROM HIGH OPERATING TEMPERATURES. IF THIS OCCURS, VARIOUS WARNING LAMPS WILL BE ILLUMINATED ON THE INSTRUMENT PANEL. CONSEQUENCE: THE VEHICLE MAY ENTER A FAIL-SAFE/LIMP-HOME MODE THAT LIMITS THE DRIVABILITY OF THE VEHICLE. THE HYBRID SYSTEM COULD ALSO SHUT DOWN COMPLETELY RESULTING IN A VEHICLE STALL, INCREASING THE RISK OF A CRASH. **JUST CAUSE MY SPECIFIC CAR WAS NOT INCLUDED IN THE RECALL DOESN'T MEAN IT SHOULDN'T HAVE BEEN WHEN IT IS DOING THE EXACT SAME THING THAT THE OTHER RECALLED CARS ARE DOING.**

78.     Similarly, in December 2017, the driver of a 2010 model-year Prius reported to NHTSA that the vehicle had stalled while driving and that its IPM had failed, but was not repaired because the vehicle was excluded from the recall:

THE CONTACT OWNS A 2010 TOYOTA PRIUS. THE CONTACT STATED THAT THE **VEHICLE EXPERIENCED A LOSS OF ENGINE POWER. THE CHECK HYBRID SYSTEM WARNING INDICATOR ILLUMINATED.** THE VEHICLE WAS TOWED TO TOYOTA OF GREENVILLE LOCATED AT 2686 LAURENS RD, GREENVILLE, SC WHERE IT WAS **DIAGNOSED AS AN IPM FAILURE AND THE INVERTER WOULD NEED TO BE REPLACED.** THE CONTACT REFERENCED NHTSA CAMPAIGN NUMBER: **14V053000 (HYBRID PROPULSION SYSTEM,**

-25-



**ELECTRICAL SYSTEM) HOWEVER THE DEALER INFORMED THE CONTACT THE VIN WAS NOT INCLUDED. THE VEHICLE WAS NOT REPAIRED.** THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 132,000.

79.    And in a report that was submitted to NHTSA in February 2016, a 2012 model-year Prius that was excluded from the safety recall stalled on the highway, which resulted in an injury to the driver and the total loss of the vehicle:

**THE CONTACT OWNED A 2012 TOYOTA PRIUS. WHILE DRIVING 60 MPH, THE ENGINE STALLED.** VARIOUS WARNING LIGHTS ILLUMINATED AND A BEEPING NOISE WAS PRESENT. **THE CONTACT'S VEHICLE COASTED TO A STOP AND WAS REAR ENDED BY ANOTHER VEHICLE. A POLICE REPORT WAS FILED. THE AIR BAGS DID NOT DEPLOY. THE CONTACT SUSTAINED INJURIES TO THE FOREARM THAT REQUIRED MEDICAL ATTENTION.** THE VEHICLE WAS NOT DIAGNOSED NOR REPAIRED. THE VIN WAS **NOT INCLUDED IN NHTSA CAMPAIGN NUMBER: 14V053000 (ELECTRICAL SYSTEM, HYBRID PROPULSION SYSTEM).** THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. **THE VEHICLE WAS DESTROYED AND TOWED.** THE FAILURE MILEAGE WAS APPROXIMATELY 45,000.

80.    Despite these and myriad other complaints, TMS has done nothing to correct the IPM Defect in Class Vehicles.

81.    As a result of TMS's wrongful conduct, Plaintiffs and proposed Class Members have needlessly been put at risk of injury and death and are forced to bear the cost of replacing the IPM and/or the inverter in their Class Vehicles to negate that risk, notwithstanding that many Class Vehicles are still covered by a warranty. This is so because TMS refuses to replace IPMs at its expense unless the IPM has already failed—even though TMS has explicitly recognized that IPM failure occurs while the vehicle is being driven, most often while the engine is

1  accelerating or otherwise put under heavy loads that create thermal

2  stress.

3      82.  Plaintiffs and proposed Class Members have lost money or

4  property as a result of TMS's fraudulent concealment of the IPM Defect.

5  For example, proposed Class Members all own or have owned a Class

6  Vehicle that that suffers from the IPM Defect, an inherently defective

7  condition that will require Plaintiffs and proposed Class Members to

8  bear the cost of replacing a defective IPM if the IPM Defect has not yet

9  manifested in an engine stall or crash. In other words, even though TMS

10  created the IPM Defect and has recognized that defective IPMs pose a

11  serious safety risk, TMS refuses to cover the replacement of a defective

12  IPM under its warranty until **after** the IPM fails, thereby forcing

13  customers who wish to eliminate the safety risk **before** it causes an

14  injury or death to bear the cost of replacing the IPM themselves—

15  notwithstanding the prohibitive cost of an IPM replacement, which

16  easily exceeds $3,000.

17      83.  TMS acquired its knowledge of the IPM Defect through

18  sources not available to proposed Class Members, including, but not

19  limited to, testing TMS conducted on Class Vehicles before they were

20  sold to the public; experience with other vehicles (*e.g.,* the Toyota

21  Highlander and the Lexus RX400h hybrids, which are also affected by

22  the IPM Defect); early consumer complaints about engine stalling and

23  problems with the IPM and/or the inverters installed in Class Vehicles

24  and testing and analyses conducted in response to those complaints;

25  aggregate data from Toyota dealers (including the number of inverter

26  and/or IPM replacements and information provided by the owner of

27  Claremont Toyota, who offered Toyota technology that he had developed

28  to ensure that vehicles that should be recalled were not sold in defective

-27-

condition, including Class Vehicles affected by the IPM Defect); FMEAs; and other internal TMS sources that are not available to proposed Class Members.

84.     TMS had—and continues to have—a duty to disclose information about the existence, nature, and scope of the IPM Defect to the proposed Class Members who purchased their Class Vehicles new or used by virtue of, *inter alia*: **(a)** TMS's knowledge that Plaintiffs and the proposed Class Members were not reasonably likely to discover the facts about the IPM Defect because those facts were known by and accessible only to TMS; **(b)** TMS's active concealment of those facts from Plaintiffs and the proposed Class Members (including, but not limited to, "reflashing" the ECU software as a means of masking the IPM Defect and lulling proposed Class Members into a false sense of security by announcing the "Warranty Enhancement Program"); **(c)** affirmative statements made by TMS in connection with the Prius recalls, including statements about the nature and scope of its warranty coverage; and **(d)** TMS's statutory and common-law obligations to disclose product defects to the consumers of those products, particularly where, as here, those defects are safety-related.

85.     Because TMS had a duty to disclose what it knew about the IPM Defect to Plaintiffs and the proposed Class Members no later than 2008, when TMS became aware of the IPM Defect, TMS was obligated to take reasonable and appropriate steps to effectively communicate to prospective purchasers and lessees of Class Vehicles that, *inter alia*, the IPMs installed in these vehicles have an inordinate propensity to cause their engines to stall and create other, safety-related problems that would not occur in a non-defective vehicle; that the IPM Defect can and does lead to situations that create a safety risk; that the cost of a

-28-

1    replacement IPM amounts to a significant percentage of a Class

2    Vehicle's purchase price; and that Class Vehicles whose ECUs have had

3    their software "reflashed" may perform poorly with reduced gas mileage

4    and increased exhaust emissions, contrary to the statements TMS made

5    publicly about the ostensible fuel-efficiency and environmental

6    friendliness of those hybrid vehicles.

7         86.     Yet, rather than disclosing this information—to which TMS

8    had exclusive access and Plaintiffs and members of the proposed Class

9    had no reasonable means of obtaining—to Plaintiffs and the proposed

10    Class Members, TMS issued a bulletin on February 6, 2018, in which it

11    made the following representations and gave the following instructions

12    to its dealers:

> Some news outlets may release reports in the coming days about class-action lawsuits and specific concerns related to the effectiveness of the remedy for Safety Recalls E0E and F0R; involving the Prius and Prius V. These reports may claim that the remedy for these programs does not adequately address the safety risks identified.
>
> Toyota believes these Safety Recall remedy actions and related Warranty Enhancement Programs (ZE3 and ZF5) are the appropriate measures for customer safety and satisfaction.
>
> If you are contacted by a Prius or Prius V driver concerned about these reports, please follow the guidance below: . . .
>
> • Explain that the Safety Recall remedy addresses the safety defect. It is designed to ensure that the vehicle will enter a fail-safe driving mode in the unlikely event of an intelligent power module failure. The attached Customer FAQs should also be used as a reference. . . .
>
> There are no changes to Safety Recall E0E and F0R or the supplementary Warranty Enhancement Programs ZE3 and ZF5. Please continue to follow the associated documentation

found on the Technical Information System (TIS) for applicable vehicles.[7]

87.    Around the same time period, TMS instructed dealers to send it the IPMs and inverters removed from Class Vehicles. By March 30, 2018, TMS received over 800 IPMs and a small number of inverters, and that number increased to over *1,000* IPMs fewer than five weeks later. TMS continues to receive IPMs and inverters and has declined to refrain from destructive testing of those components, notwithstanding its fundamental obligation to preserve evidence. Plaintiffs will address the matter further after they have had an opportunity to examine the relevant facts by way of formal discovery.

88.    By engaging in the conduct described herein, TMS has concealed, and continues to conceal, the IPM Defect from the proposed Class Members. If the proposed Class Members had knowledge of the information TMS has concealed, they would have had, among other things, the opportunity to factor the existence of the IPM Defect into their decision to purchase or lease (or not to purchase or lease) a Class Vehicle or to pay a price for the Class Vehicle that reflected its actual value in light of the existence of the IPM Defect. Similarly, proposed Class Members would also have had the opportunity to insist that TMS bear the costs associated with IPM replacements when an IPM malfunctions, rather than accepting an ineffective ECU software update in lieu of replacing the IPM, if they had been aware of the information that TMS concealed from them.

---

[7] A true and correct copy of this bulletin, titled "2010-2014 Prius and 2012-2014 Prius V: Safety Recalls E0E and F0R," is attached hereto as **Exhibit B.**



89.   By engaging in the conduct described above and by selling the Class Vehicles while concealing the existence, nature, and scope of the IPM Defect from Plaintiffs and members of the class he proposes to represent in this action, TMS has engaged in unconscionable conduct that constitutes common law fraudulent concealment and trespass to chattels, and has violated the statutory proscriptions set forth in, *inter alia*, California Civil Code, Civ. Code § 2313; the Consumers Legal Remedies Act ("CLRA"), Civ. Code §§ 1750-1784; and the Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200-17209.

## STATUTES OF LIMITATION

90.   Any applicable statutes of limitation have been tolled by TMS's knowing and active concealment of the information it possessed about the true nature and characteristics of the defective IPMs it installed in Class Devices and by TMS's false and misleading representations regarding Class Vehicles' safety and performance. TMS has kept Plaintiffs and the members of the proposed class ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the proposed class could not reasonably have discovered this information or what TMS knew about any of the issues and facts described herein.

91.   TMS was, and is, under a duty to disclose the true nature, purpose, and characteristics of the IPM Defect, which arises regardless of the existence of privity with Plaintiffs or members of the proposed class. *See*, *e.g.,* Cal. Civ. Code § 1711. Despite that duty, TMS knowingly, affirmatively, and actively concealed the facts alleged herein, and the concealment is ongoing. Because, *inter alia*, TMS took steps to conceal such information, Plaintiffs and members of the proposed class did not

COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES

1  discover and could not have discovered these facts through the exercise
2  of reasonable diligence.

3      92.    Based on the foregoing, TMS is estopped from relying on any
4  statutes of limitation in defense of this action. The causes of action
5  alleged herein did or will accrue only upon discovery of the facts alleged
6  herein and TMS's fraudulent concealment thereof.

7  **CLASS ALLEGATIONS**

8      93.    Plaintiffs bring this class action on behalf of themselves and
9  all other persons similarly situated pursuant to the provisions of Federal
10  Rule of Civil Procedure 23 and California Civil Code section 1781.

11      94.    Plaintiffs seek to represent a class composed of: **(a)** all
12  residents of the United States who currently own or lease a Class Vehicle;
13  and **(b)** all residents of the United States who formerly owned or leased a
14  Class Vehicle and paid to replace or repair an IPM in those vehicles.

15      95.    Plaintiffs also seek to represent two subclasses composed of all
16  California residents who own or have owned or leased a Class Vehicle **(a)**
17  for personal or family (*i.e.,* non-business) use (the "CLRA subclass") and
18  **(b)** that TMS included in the recall it announced in February 2014 and
19  expanded in July 2015 and had its ECU software updated in connection
20  with that recall (the "Recall Subclass").

21      96.    Excluded from the class are the following:

22          a.    TMS, its subsidiaries, affiliates, officers, directors, and
23  employees;

24          b.    The judge assigned to preside over this action;

25          c.    Persons who have claims for personal injuries as a result
26  of the IPM Defect;

27
28

d.      Persons who have filed separate, non-class legal actions against TMS asserting consumer-fraud claims based on the IPM Defect in Class Vehicles; and

e.      Persons who have pursued a claim and obtained a verdict against or settled with and validly released TMS from individual claims substantially similar to those alleged in this Complaint with respect to Class Vehicles.

97.    The proposed class comprises thousands of persons throughout the United States who own or lease, or have owned or leased, one or more Class Vehicles. The proposed class is, therefore, so numerous and geographically dispersed that joinder of all members in one action is impracticable, if not impossible.

98.    As alleged more fully in paragraphs 1 through 92, above, TMS has acted with respect to Plaintiffs and proposed Class Members in a manner generally applicable to each of them. There is a well-defined community of interest in the questions of law and fact involved, which affect all proposed Class Members. The questions of law and fact common to the class predominate over the questions that may affect individual proposed Class Members include, but are not limited to, the following:

a.      whether Class Vehicles are affected by the IPM Defect;

b.      whether TMS knew or reasonably should have known of the IPM Defect in Class Vehicles before it sold or leased them to proposed Class Members;

c.      whether TMS knew or reasonably should have known that the IPM Defect is a safety hazard;

d.      whether TMS actively concealed the IPM Defect from Plaintiffs and proposed Class Members;

1    e.    whether TMS actively concealed material facts

2  concerning the ECU software updates from Plaintiffs and proposed Class

3  Members;

4    f.    whether the information TMS concealed is material to

5  prospective purchasers and lessees of Class Vehicles;

6    g.    whether TMS wrongfully profited from causing the

7  distribution and sale or lease of Class Vehicles under false pretenses, by

8  failing to inform Plaintiffs and proposed Class Members about the IPM

9  Defect;

10    h.    whether, under the circumstances alleged herein, TMS

11  wrongfully profited from the sale of replacement IPMs and/or hybrid

12  inverter assemblies;

13    i.    whether TMS's conduct, as alleged in this Complaint,

14  constitutes fraudulent concealment;

15    j.    whether TMS's conduct, as alleged in this Complaint,

16  has violated the CLRA;

17    k.    whether TMS's conduct, as alleged in this Complaint,

18  has created an express warranty under California Commercial Code

19  section 2313, which was then violated;

20    l.    whether TMS's conduct, as alleged in this Complaint,

21  constitutes an unlawful, fraudulent, and/or unfair business act or practice

22  under the UCL;

23    m.    whether TMS's conduct, as alleged in this Complaint,

24  has led to its unjust enrichment;

25    n.    whether TMS should be required to repair or replace the

26  IPMs in Class Vehicles or otherwise rectify the IPM Defect in those

27  vehicles;

28

-34-

COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES

       o.     whether proposed Class Members are entitled to recover statutory damages under the CLRA;

       p.     whether proposed Class Members are entitled to recover compensatory damages;

       q.     whether proposed Class Members are entitled to an award of restitution under the UCL; and

       r.     whether TMS's willful, fraudulent conduct warrants the imposition of punitive damages.

99.    The class is readily ascertainable, and prosecution as a class action will eliminate the possibility of repetitious litigation and will provide redress for claims too small to support the expense of individual, complex litigation. Absent a class action, proposed Class Members will continue to suffer losses, TMS's violations of law will be allowed to proceed without remedy, and TMS will retain revenue as a result of its wrongdoing. A class action, therefore, provides a fair and efficient method for adjudicating this controversy.

100.  Plaintiffs are asserting claims that are typical of the proposed class in that Plaintiffs own a Class Vehicle; each of the two named Plaintiffs is a "consumer" and a "buyer" as those terms are defined in the CLRA and that Plaintiffs have lost money or property as a result of the TMS's conduct as those terms are defined in the UCL.

101.  Plaintiffs will fairly and adequately represent and protect the interests of the proposed class, and he has no interests that are antagonistic to or in conflict with those he seeks to represent.

102. Plaintiffs have retained competent counsel who have considerable experience and success in the prosecution of class actions involving the sale of defective consumer products, including motor vehicles, and other forms of complex litigation.

103.   In view of the complexity of the issues and the expense that an individual proposed Class Member would incur if he or she attempted to obtain relief from a large corporation such as TMS, the claims of individual proposed Class Members do not involve monetary amounts that are sufficient to support separate actions.   Because of the size of individual proposed Class Member's claims, few, if any, proposed Class Members could afford to seek legal redress for the wrongs complained of in this Complaint.

104.   The prosecution of separate claims by individual proposed Class Members would create a risk of inconsistent or varying adjudications with respect to at least thousands of individual proposed Class Members, which would, as a practical matter, dispose of the interests of the proposed Class Members not parties to those separate actions, or would substantially impair or impede their ability to protect their interests and enforce their rights.

105.   The proposed class meets the requirements of Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), and, to the extent applicable, California Civil Code section 1781 and the cases construing and applying both.

### FIRST CAUSE OF ACTION
#### FRAUDULENT CONCEALMENT
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS

106.   Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 1 through 92, above.

107.   As alleged more fully herein, at the time TMS sold or leased Class Vehicles to Plaintiffs and proposed Class Members, TMS knew they were equipped with defective IPMs.

108.   At all times relevant herein, TMS made misrepresentations of material fact to Plaintiffs and the other proposed Class Members as a



means of concealing the true nature and scope of the IPM Defect, claiming that the stalled engines it was causing could be solved by a software update that TMS would perform in the context of a sham recall that began in or about February 2014.

109.  TMS has concealed material facts from Plaintiffs and the other proposed Class Members, including but not limited to:

a.      the existence, nature, and scope of the IPM Defect;

b.      that updating the IPM software in Class Vehicles did not cure the IPM Defect;

c.      that the IPM Defect could only be remedied by replacing the IPM with a non-defective IPM; and

d.      that IPM concealed the foregoing facts from Plaintiffs and the proposed Class Members as a means for TMS to avoid the expense involved with replacing IPM at no cost to the proposed Class Members.

110.  TMS had a duty to disclose these facts by virtue of: **(a)** TMS's exclusive knowledge about the nature and scope of the IPM Defect; **(b)** TMS's  awareness that Plaintiffs and the proposed Class Members were not reasonably likely to discover these facts; **(c)** TMS's active concealment of those facts from Plaintiffs and the proposed Class Members (by, among other things, making the false representations described above); and **(d)** TMS's statutory and common-law obligations to disclose material information to the consumers who own or formerly owned Class Vehicles, as alleged herein. Plaintiffs and the proposed Class Members would have acted differently had TMS disclosed this information to them and allowed them to make fully-informed decisions before purchasing or leasing a Class Vehicle.

111.  The facts TMS has concealed from Plaintiffs and the proposed class are material and uniform in nature.

112.  TMS made misrepresentations of material fact in an effort to conceal the existence, nature, and scope of the IPM Defect and to prevent proposed Class Members from becoming aware of the true nature and scope of the IPM Defect. Plaintiffs and members of the proposed class would have either purchased a different vehicle or paid significantly less for their Class Vehicles had TMS disclosed the facts it concealed from them.

113.  As a proximate result of TMS's concealment and suppression of material facts, Plaintiffs and the proposed Class Members have sustained damage by, among other things, paying more for their Class Vehicle than they were actually worth; and bearing the cost of repairs or purchasing replacement IPMs due to the IPM Defect.

114.  Because  TMS  engaged  in  the  conduct  alleged  herein deliberately  and  with  willful  and  malicious  intent,  Plaintiffs  and  the proposed Class Members are entitled to an award of punitive damages, the total amount of which shall be proven at trial.

## SECOND CAUSE OF ACTION
### DECEPTIVE BUSINESS PRACTICES IN VIOLATION OF THE CLRA
### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLRA SUBCLASS

115.  Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 1 through 92, above.

116.  The acts and practices described in this Complaint were undertaken by TMS in connection with a "transaction" that was intended to and did result in proscribed practices as a result of the sale or lease of a motor vehicle to Plaintiffs, each of whom are a "consumer," as those terms are defined in Civil Code sections 1761(d) (defining "consumer"), 1761(e) (defining  "transaction")  and  1770(a)  (describing  "list  of  proscribed practices"). Motor vehicles are "goods" as that term is defined in Civil Code

section 1761(a). TMS's acts and practices, as alleged in paragraphs 1 through 92, above, violated, and continue to violate, the CLRA in at least the following respects:

       a.    representing that Class Vehicles have characteristics, uses or benefits that they do not have, in violation of section 1770(a)(5) of the CLRA;

       b.    representing that Class Vehicles are of a particular standard, quality or grade when they are of another, in violation of section 1770(a)(7) of the CLRA; and

       c.    representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law in violation section 1770(a)(14) of the CLRA.

117.  Plaintiffs seek and are entitled to equitable relief in the form of an order: **(a)** enjoining TMS from continuing to engage in the deceptive business practices described in this Complaint; **(b)** requiring TMS to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint; **(c)** requiring TMS to disgorge all ill-gotten gains flowing from the conduct described in this Complaint; and **(d)** requiring TMS to provide public notice of the true nature and scope of the IPM Defect

118.  Pursuant to section 1782 of the CLRA, Plaintiffs notified TMS in writing of the particular violations of section 1770 of the CLRA (the "Notice") and has demanded that TMS correct, repair, replace, or otherwise rectify the IPM Defect on July 16, 2018, by certified mail.

119.  Should TMS decline this opportunity, Plaintiff will amend this Complaint to seek actual, statutory, and punitive damages to which Plaintiff and the proposed class are entitled as a result of the IPM Defect in amounts to be proven at trial, including, but not limited to, costs

1    incurred in connection with the replacement or repair of IPMs and
2    inverters in Class Vehicles.

3    120.   Accordingly, Plaintiffs hereby seek an order requiring TMS to:
4    **(a)** to notify the proposed Class Members of the existence, nature, and
5    scope of the IPM Defect in Class Vehicles; **(b)** to repair, replace, or
6    otherwise rectify defective IPMs in Class Vehicles at its expense; and **(c)**
7    to make full restitution of all monies wrongfully obtained as a result of the
8    conduct described in this Complaint.

9    **THIRD CAUSE OF ACTION**
     **BREACH OF WARRANTY IN VIOLATION OF CAL. CIV. CODE § 2313**
10   **ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS**

11   121.   Plaintiffs reallege and incorporate by reference the allegations
12   set forth in paragraphs 1 through 92, above.

13   122.   TMS has made affirmative representations of fact about 2010
14   through 2014 model-year Class Vehicles to Plaintiffs and the proposed
15   Class Members who owned or leased those vehicles, including, but not
16   limited to, statements that in a letter that accompanied the Safety Recall
17   E0E notice (the "Recall Letter") that the defective performance of the IPMs
18   in Class Vehicles would be corrected by updating the software in the Motor
19   Generator Electronic Control Unit and Power Management Electronic
20   Control Unit of their Class Vehicles. TMS also announced, in a separate
21   letter to Plaintiffs and the proposed Class Members, a "Warranty
22   Enhancement Program" by which the warranty on IPMs in 2010 through
23   2014 model-year Class Vehicles to 15 years with no mileage limitation.

24   123.   In the bulletin that TMS distributed to dealers on or about
25   February 6, 2018 (see paragraph 86 & n. 7, above), TMS stated that
26   "Toyota believes that ***these Safety Recall remedy actions and***
27   ***related Warranty Enhancement Programs (ZE3 and ZF5) are the***

28

**COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES**

*appropriate measures for customer safety and satisfaction*." (Emphasis added.)

124. In the same bulletin, despite knowing that the software update did not eliminate the IPM Defect, TMS instructed its dealers that *if they "are contacted by a Prius or Prius V driver concerned about these reports," they should "[e]xplain that the Safety Recall remedy addresses the safety defect.*" (Emphasis added.)

125. The statements TMS made to Prius drivers were made a part of the basis of the bargain and created an express warranty that Class Vehicles would conform to those statements. Contrary to those statements, TMS knew, but fraudulently concealed from Plaintiffs and proposed Class Members, that Class Vehicles were equipped with defective IPMs that create an unreasonable safety risk and the potential to cause Class Vehicles to use more fuel and release more exhaust emissions than TMS represented they would. TMS also knew that many Class Vehicles were affected by the IPM Defect, but excluded them from the recall of 2010 through 2014 model-year Class Vehicles that Toyota announced in February 2014 and expanded in July 2015.

126. Plaintiffs, through their counsel, took reasonable steps to notify TMS that Class Vehicles were not as TMS represented them in the Notice that Plaintiffs' counsel sent to TMS (as described in paragraph 118, above).

127. TMS failed to take reasonable steps to repair or otherwise rectify the IPM Defect.

128. As a direct and proximate cause of TMS's breaches, Plaintiffs and members of the proposed class have been harmed in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### TRESPASS TO CHATTELS
### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED RECALL SUBCLASS

129.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 92, above.

Plaintiffs and members of the proposed Recall Subclass own, lease or have owned or leased one or more Class Vehicles. TMS exhorted Plaintiffs and each member of the proposed Recall Subclass to update the ECU software in their Class Vehicles. Plaintiffs and members of the proposed Recall Subclass complied with TMS's exhortations in that regard, unaware that the ECU software update did not eliminate the safety risk that led to the recall and that TMS had surreptitiously included algorithms that caused the engines in Class Vehicles to become sluggish and non-responsive, which created additional safety risks and reduced gas mileage. Had Plaintiffs known that updating the ECU software would have this effect, they would not have allowed TMS to install it or would have sought another way to address the IPM Defect.

130.   At no time did TMS advise Plaintiffs or members of the proposed Recall Subclass that the ECU software modification would not actually eliminate the safety risks posed by the IPM Defect or that it may adversely affect the performance of Class Vehicles. By effectuating such modifications without the knowledge or consent of Plaintiffs or members of the proposed Recall Subclass, TMS intentionally trespassed on and interfered with their Class Vehicles, which were the property of Plaintiffs and members of the proposed Recall Subclass.

131.   TMS's trespass was the actual, direct, and proximate cause of injury to Plaintiffs and members of the proposed class by compromising the functionality of the ECUs in Class Vehicles to the point where it

became difficult, if not impossible to use them for the ordinary purposes for which they were intended. TMS has admitted that its surreptitious modification of the ECU software had specific effects on the performance of Class Vehicles), which has significantly impaired those Class Vehicles' condition, quality, and value.

132. Plaintiffs are informed and believe that TMS trespassed and interfered with Class Vehicles for the purpose of perpetuating its fraudulent concealment of the IPM Defect. Thus, TMS knew and intended that its conduct would cause injury to Plaintiffs and members of the proposed class by adversely affecting the performance of Class Vehicles, but leaving them at inordinate risk of injury and death because the ECU software did not eliminate the IPM Defect. Thus, Plaintiffs and members of the proposed Recall Subclass were harmed as a direct result of TMS's trespass and interference and without regard to the rights of Plaintiffs or members of the proposed Recall Subclass.

133. As a result of TMS's trespass to, and interference with, Class Vehicles, Plaintiffs and the members of the proposed class are entitled to recover actual damages in amounts to be determined at trial. And, because TMS's conduct was malicious, oppressive and fraudulent, Plaintiffs and members of the proposed class are entitled to an award of punitive damages in an amount that will be determined at trial.

### FIFTH CAUSE OF ACTION
#### UNLAWFUL, FRAUDULENT, AND UNFAIR BUSINESS PRACTICES IN VIOLATION OF THE UCL
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS

134. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 92, above.

135. By committing the acts and practices alleged in this Complaint, TMS has violated the UCL (Bus. & Prof. Code §§ 17200-

-43-



17209).  The UCL is a strict liability statute and it is not necessary to show that the defendant intended to injure or harm anyone.  Plaintiffs allege that TMS violated the unlawful, fraudulent and/or unfair conduct elements of the UCL.

a.  **Unlawful Conduct**:  As a result of engaging in the conduct alleged in this Complaint**,** TMS has violated the UCL's proscription against engaging in unlawful conduct—specifically, violations of any civil or criminal, federal, state or municipal, statutory, regulatory or court-made or local law—by virtue of TMS's **(i)** fraudulent and deceitful conduct in violation of California Civil Code sections 1709 through 1711, as alleged herein, for the purpose of conceal material facts about the IPM Defect from Plaintiffs and the proposed Class Members and its violations of the CLRA (Civil Code sections 1770(a)(5), (a)(7), and (a)(14)), for the purpose of conceal material facts about the IPM Defect from Plaintiffs and the proposed Class Members; **(ii)** trespass to chattels and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFFA") and California Penal Code section 502, by exceeding any authorization TMS may have had to modify the ECU software in connection with the safety recalls of Class Vehicles without disclosing material facts pertaining to the adverse effects that modifying the ECU software would have on Class Vehicles; **(iii)** violations of California Commercial Code section 2313, by falsely representing "that the Safety Recall remedy addresses the safety defect," which TMS made to Prius drivers via Toyota dealers, thereby making that representation a material basis of the bargain and creating an express warranty that Class Vehicles would perform in accordance with those representations when they did not; and **(iv)** failure to comply with its obligations to provide notice of defects pursuant to 49 U.S.C. sections 30118(c),

-44-

30120(a) and 30120(c), and 49 C.F.R. sections 573.5, 573.6, and 573.11, which are intended to reduce the incidence of injury and death by ensuring that owners and lessees of vehicles containing safety-related defects, such as the IPM Defect, are made aware of those defects.

b. **Fraudulent Conduct**: TMS has violated the UCL's proscription against fraud as a result of engaging in the fraudulent and deceitful conduct alleged in paragraphs 1 through 92, above.

c. **Unfair Conduct**: TMS has violated the UCL's proscription against unfair conduct as a result of engaging in the fraudulent and deceptive conduct alleged in this Complaint, which violates the legislative policies underlying **(i)** the CLRA; **(ii)** the statutory provisions against the commission of fraud; **(iii)** the CFFA; **(iv)** California Penal Code section 502; and **(v)** the Transportation Recall Enhancement, Accountability and Documentation ("TREAD") Act, as codified at 49 U.S.C. §§ 30101, 30112, 30115-30120. An "unfair" practice may be any conduct that is deemed immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

136.   Plaintiffs and proposed Class Members have suffered injury in fact and have lost money and functional property as a result of TMS's actions, as alleged herein.

137.   Plaintiffs seek an order of this Court pursuant to section 17203 of the UCL, requiring TMS: **(a)** to notify the proposed Class Members of the existence, nature, and scope of the IPM Defect in Class Vehicles; **(b)** to replace defective IPMs in Class Vehicles at its expense; and **(c)** to make full restitution of all monies wrongfully obtained directly or indirectly from Plaintiffs and the proposed Class Members as a result of the conduct described in this Complaint.

## SIXTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS

138. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 92, above.

139. By engaging in the conduct described in this Complaint, TMS has been unjustly enriched by their sale of Class Vehicles by concealing the IPM Defect.

140. As a proximate result of TMS's unlawful, fraudulent, and unfair conduct, TMS has obtained revenues by which it has become unjustly enriched at Plaintiffs' and members of the proposed class's expense. Under the circumstances alleged herein, it would be unfair and inequitable for TMS to retain the profits it has unjustly obtained at the expense of the Plaintiffs and the proposed class.

141. Accordingly, Plaintiffs seek an order: **(a)** requiring TMS to replace defective IPMs in Class Vehicles at no cost to Plaintiffs and the Class Members; **(b)** establishing TMS as constructive trustee of the funds that served to unjustly enrich it, together with interest during the period in which TMS has retained such funds, **(c)** requiring TMS to make full restitution of those funds to Plaintiffs and the Class Members in a manner to be determined by the Court; and **(d)** requiring TMS to provide public notice of the true nature and scope of the IPM Defect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, prays for relief, jointly and severally, pursuant to each cause of action set forth in this Complaint as follows:

1. For an order certifying that the action may be maintained as a class action.

-46-

COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES

2.   For an award of equitable relief as follows: (a) requiring TMS to replace defective IPMs in Class Vehicles; (b) requiring TMS to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint; and (c) requiring TMS to provide public notice of the true nature and scope of the IPM Defect.

3.   For damages sustained as a result of the IPM Defect in amounts to be proven at trial, including, but not limited to, costs incurred in connection with the replacement or repair of the IPM or hybrid inverter assembly in Class Vehicles.

4.   For an award of statutory damages.

5.   For an award of punitive damages.

6.   For an award of attorneys' fees pursuant to, *inter alia*, California Civil Code section 1780(d), California Code of Civil Procedure section 1021.5, and the common-fund doctrine.

7.   For an award of costs.

8.   For pre- and post-judgment interest on any amounts awarded.

9.   For such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury with respect to all issues so triable.

DATED:  July 17, 2018                     FAZIO | MICHELETTI LLP


by   /s/ *Jeffrey L. Fazio*
                                              Jeffrey L. Fazio

Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
FAZIO | MICHELETTI LLP
2410 Camino Ramon, Suite 315
San Ramon, CA  94583
T:  925-543-2555
F:  925-369-0344



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Charles J. LaDuca (*pro hac vice* forthcoming) (charles@cuneolaw.com)
Michael J. Flannery (196266) (mflannery@cuneolaw.com)
**CUNEO GILBERT & LADUCA. LLP**
4725 Wisconsin Ave. NW, Suite 200
Washington. D.C. 20016
T: 202-789-3960
F: 202-789-1813

William M. Audet (117456) (waudet@audetlaw.com)
Gwendolyn R. Giblin (181973) (ggiblin@audetlaw.com)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
T: 415-568-2555
F: 415-568-2556

Donald R. Pepperman (109809) (dpepperman@bakermarquart.com)
**BAKER & MARQUART LLP**
2029 Century Park East, Sixteenth Floor
Los Angeles, CA 90067
**T:** 424-652-7804
**F:** 424-652-7850

Attorneys for Plaintiffs
Rajdave Bhandari and Jevdet Rexhepi,
Sophean Hing, on behalf of themselves
and all others similarly situated



---

**-48-**



EXHIBIT A

# Toyota Prius software fix may reduce fuel efficiency, experts say

[Ralph Vartabedian](#)



About 800,000 Toyota Priuses were recalled in 2014 to address overheating. Some drivers and experts who studied Toyota documents say the company's software fix resulted in a reduction in fuel economy. (Joe Raedle / Getty Images)

When Robert Enger took his Toyota Prius into a dealership for a safety recall, he didn't expect that his fuel economy would drop.

Just six months after buying the new 2013 Prius, Enger learned that the company was recalling it to fix the car's hybrid electrical system, which was overheating and frying itself. A technician plugged the car into a diagnostic tool that installed new computer code in two electronic modules. That was

supposed to fix the problem.

The repair itself has become controversial amid allegations that the electrical systems are still overheating after the software fix. But Enger noticed something else: His fuel economy dropped by 5 miles per gallon in city driving. Enger, an electrical engineer from Hermosa Beach, checks his mileage every fill-up, dividing the number of miles he drove since the last fill-up by the number of gallons he pumped to top off the tank.

About 800,000 Toyota Priuses in the U.S. were recalled in 2014 to address overheating that damages the car's inverter, a key part of the electrical power system. A lawsuit brought last year by one of Southern California's largest Toyota dealers asserted that the software fix did not solve the overheating problem and could lead to an abrupt loss of power. A related complaint by the dealer is now under review by the National Highway Traffic Safety Administration.

Academic experts contacted by The Times said it is likely the software change reduced the car's fuel efficiency. And a lawsuit this month in federal court makes allegation that Toyota "concealed from consumers that the software reflash decreased the fuel efficiency — defeating the very purpose of owning these hybrid vehicles."

A statement by Toyota did not directly address questions about whether fuel economy and emissions are affected, but said the company would defend itself against such allegations.

The company's documents show it modified not only software that controls the inverter's function, but also the software in the vehicle's powertrain control computer that determines how much power is supplied to the transmission by the gasoline engine and by the electric motors, according to the experts, hybrid vehicle engineers at major academic research centers.

The inverter, a device about the size of a large shoe box, boosts the battery's 200 volts to about 500 volts for the electric motors and converts the battery's direct current to alternating current (similar to what comes out of a household outlet). When the brakes are applied, the power flows in the other direction to charge the battery.

The change in the powertrain software and evidence of physical problems in the inverter probably shows that the company's modification reduced the power supplied by the battery and increased reliance on the Prius' four-cylinder gasoline engine, according to the academic experts who have reviewed those filings. If so, the car's fuel economy probably dropped and its emissions increased, they say.

The Prius has an EPA fuel economy rating of 51 miles per gallon in city driving for the 2010 model and 49 mpg for the 2014 model. Enger said his city driving mileage dropped from 49 mpg before the software change to 44 mpg afterward.

Assertions that the Toyota software change decreased the car's fuel economy are contained in a lawsuit seeking class-action status filed this month in U.S. District Court in Los Angeles. "Unbeknownst to drivers, Toyota reduced the vehicles' fuel efficiency, which is the main reason why consumers purchase Priuses," it alleges. The suit by two Toyota owners, filed by Los Angeles attorney Skip Miller, contends that Toyota's inaccurate fuel efficiency claims violate various consumer protection laws and result in fraud, false advertising and breach of contract.

Roger Hogan, who owns two big Toyota dealerships in Southern California, has sued Toyota, alleging that more than 100 Priuses have come to his service departments with failed inverters after the software fix was made.

Hogan's suit said that Toyota was slow to notify owners of the defect. It said

that the company waited several years to issue the recall for the basic Prius after knowing about the problem and then waited another 18 months to extend the recall to the Prius V.



Toyota of Claremont refuses to sell these Priuses because, a lawsuit alleges, they have a defect that can cause the cars to lose power. Owner Roger Hogan, center, filed the suit. (Gina Ferazzi / Los Angeles Times)

Toyota officials at the company's U.S. headquarters in Texas issued a statement disputing the allegations in the class-action suit, saying they are without merit. They previously said the Hogan suit is without merit.

"Toyota's focus remains on the safety and security of our customers, and we stand behind the effectiveness and appropriateness of the Prius inverter recall remedy," the statement said. "Due to the pending litigation, we cannot address the specific fuel economy claims in detail at this time, however, we intend to defend against them vigorously."

The company notified the California Air Resources Board of the software

change in January 2014, saying that that it made "no significant difference on emissions and fuel economy," according to a board spokeswoman. NHTSA referred questions about the performance to the Environmental Protection Agency, which did not respond by the time of publication.

The Times interviewed more than a dozen Prius owners who described reliability and fuel consumption issues with their Priuses. When the inverter overheats, the car can suffer a total loss of power or enter what Toyota calls a "limp home mode." When it happens, the dashboard lights up with warnings.

Kathleen Ryan, a Marina del Rey Prius owner who got the software fix in 2014, was driving in the fast lane on the 91 Freeway in January, cruising along at 70 mph, when suddenly "it felt like somebody pulled the emergency brake."

The car slowed down to 15 mph and Ryan had to cross three lanes of high-speed traffic that was swerving around her slow car. Several California Highway Patrol Officers on the shoulder, who had stopped to deal with a stalled big rig, told her she was lucky to be alive, she said.

"If I had been in an accident, nobody would know how it happened," said Ryan. "They would say, 'Oh, this old lady doesn't know how to drive.' If somebody dies, we wouldn't even know how it happened."

Jason Levine, executive director of the Center for Auto Safety, said that a car in limp-home mode may be better than a full stall, but still puts drivers in a "freaky" situation. "You have gone to a large golf cart," he said.

Levine and others compare Toyota's software fixes to Apple's secret modification of software that controls the iPhone, slowing down the device as the battery ages and loses its ability to hold a full charge. The Securities and Exchange Commission and the Justice Department said in January they were

launching investigations into Apple's practices.

In many cases, the inverters fail when drivers step hard on the accelerator or brake hard, which subjects the inverter to high loads. In its recall notice to owners, Toyota suggested drivers should temporarily take it easy on their Priuses: "Until the remedy is performed, drivers should avoid placing a high load on the hybrid system by avoiding full throttle application when possible."

The company has been struggling with the overheating problem in the Prius as far back as May 2011, according to a "defect information report" that it filed with federal safety regulators in 2014. Its engineers examined the possibility that solder joints were cracking, a result of "excessive thermal stress."

In following years, engineers found cracks in the solder, but could not find a problem in its manufacturing process. Later, the report said, the cracks were not turning up in the wagon version of the vehicle, the Prius V, which has the same inverter. By 2014, Toyota finally settled on changing the software in the inverter and engine controller. It told federal regulators it would sent owners notices by 2015.

The overheating occurs in special electronic devices, known as "insulated gate bipolar transistors," or IGBTs, which boost voltage and convert the DC power from the battery to AC power.

Heath Hofmann, an electrical engineering professor at the University of Michigan and an expert in hybrid vehicle power systems, describes the transistors as high-power switches that turn on and off thousands of times per second. The auto industry is trying to find a substitute for the silicon transistors, but so far continues to use IGBTs. It is likely the transistor loads are at the heart of Toyota's problem, he said, based on the defect information

Toyota Prius loses gas mileage after safety recall - LA Times 7/11/18, 4:03 PM

reports.

"It strongly suggests that they did something to change the vehicle's overall power management system," Hofmann said after looking at some of the Toyota recall documents. "The likely thing they did was reduce the power running through the inverter and the motor generator, particularly if they are having problems in high power demand situations."

Michael Pecht, a University of Maryland professor who founded the school's Center for Advanced Life Cycle Engineering, which focuses on electronics reliability, also reviewed the Toyota recall documents. "Clearly, they are saying the problem is in the IGBT, but they couldn't find the cause for two years," he said.

Pecht said the software fix to reduce temperatures in the inverters may help, but "it is just going to delay when the failure occurs. My gut is that the software fix saves money. This is really serious. The inverters need to be replaced."

In his lawsuit, Hogan alleges that replacing an inverter costs more than $2,000, while the software fix costs the manufacturer $80.

Hogan said a few Toyota owners have returned to his dealership, saying their Prius suffered a loss of fuel economy after the software fix. A few Prius owners contacted by The Times said they did not notice any change in their fuel economy. Other Prius owners have made the same complaint as Enger in Toyota chat rooms, saying it "detunes" their cars and increases the use of the gasoline engine.

In many cases, however, Prius owners may not know their fuel economy has degraded because they don't routinely check it or they may not associate it with the software recall.

Enger, the Hermosa Beach engineer, said he tried to get answers from his dealer and then finally called Toyota's customer service hotline. He said he wasn't able to get to the bottom of his problem with customer relations.

"It was like talking to a cat," he said.

**[ralph.vartabedian@latimes.com](mailto:ralph.vartabedian@latimes.com)**

### Follow me on Twitter [@rvartabedian](https://twitter.com/rvartabedian)



Ralph Vartabedian, a national correspondent at the Los Angeles Times, joined the newspaper in 1981. In his many reporting assignments, he has written on Toyota vehicle defects, presidential candidates, the New Orleans levee failures, the defense industry, the Columbia space shuttle accident investigation, nuclear weapons, tax collection abuses, and the California bullet train, among much else.He won the2015 Gerald Ford PresidentialFoundation award for defense writing, as well asLoeb awards in



EXHIBIT B

**TOYOTA MOTOR NORTH AMERICA** | **Quality**

Product Quality and Service Support, Quality Compliance
Published: February 6, 2018

Approved By: Tom Trisdale
                Vice-President, Product Quality and Service Support

**Toyota Motor Sales, USA, Inc.**
6565 Headquarters Drive
Plano, TX 75024
(469) 292-4000

To:      All Toyota Dealers

From:   Quality Division - Product Quality and Service Support

<h2 style="text-align:center;color:red;">**IMPORTANT NOTICE**</h2>

**2010-2014 Prius and 2012-2014 Prius V:  Safety Recalls E0E and F0R**

Some news outlets may release reports in the coming days about class-action lawsuits and specific concerns related to the effectiveness of the remedy for Safety Recalls E0E and F0R; involving the Prius and Prius V. These reports may claim that the remedy for these programs does not adequately address the safety risks identified.

Toyota believes these Safety Recall remedy actions and related Warranty Enhancement Programs (ZE3 and ZF5) are the appropriate measures for customer safety and satisfaction.

If you are contacted by a Prius or Prius V driver concerned about these reports, please follow the guidance below:

- Confirm if the specific vehicle has ANY open Safety Recalls. If yes, advise that the vehicle should be brought to the dealership for service and completion of the applicable remedy

- Ask if any vehicle Warning Lamps are currently displayed, and if Yes, verify the vehicle is included in Safety Recall E0E or F0R [whether completed in the past or not] and arrange appointment and vehicle pickup for inspection/repair.

- Explain that the Safety Recall remedy addresses the safety defect. It is designed to ensure that the vehicle will enter a fail-safe driving mode in the unlikely event of an intelligent power module failure. The attached Customer FAQs should also be used as a reference.

- The distance a vehicle will continue to travel in fail-safe driving mode will vary based upon the hybrid battery state of charge and road conditions.

- If a vehicle enters fail-safe driving mode, the driver should pull-over and stop the car in a safe area.  The driver should immediately contact his/her local Toyota dealer for assistance.

There are no changes to Safety Recall E0E and F0R or the supplementary Warranty Enhancement Programs ZE3 and ZF5. Please continue to follow the associated documentation found on the Technical Information System (TIS) for applicable vehicles.

Please ask your technicians to contact Technical Assistance for any questions on the Technical Instructions or Technical Service Bulletins related to these programs.  Your District Service and Parts Manager or Field Technical Specialist can also assist with questions on these programs.

© 2018 Toyota Motor Sales, USA

**Refer to the Dealer Letters on TIS for additional information.**

<u>Safety Recall E0E Dealer Package</u>
https://one.tis.toyota.com/t3Portal/siviewer/pub/T-CP-E0E-A110-D

<u>Safety Recall F0R Dealer Package</u>
https://one.tis.toyota.com/t3Portal/siviewer/pub/T-CP-F0R-A110-D

<u>Warranty Enhancement Program ZE3 Dealer Package</u>
https://one.tis.toyota.com/t3Portal/siviewer/pub/T-CP-ZE3-A110-D

<u>Warranty Enhancement Program ZF5 Dealer Package</u>
https://one.tis.toyota.com/t3Portal/siviewer/pub/T-CP-ZF5-A110-D

Thank you for your cooperation.
TOYOTA MOTOR SALES, U.S.A., INC.

© 2018 Toyota Motor Sales, USA